IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARK HOLLINGSWORTH,     *

Petitioner,          *

v.             *    Civil Action No. PX-22-676

JEFFREY NINES and the ATTORNEY  *
GENERAL OF THE STATE OF MARYLAND,

Respondents.

           ***

**<u>MEMORANDUM OPINION</u>**

Mark Hollingsworth brings this federal habeas corpus Petition pursuant to 28 U.S.C. § 2254, challenging his 1999 state court convictions for first- and second-degree murder and related offenses. ECF No. 1. The Petition is ready for resolution, and no hearing is necessary. *See* D. Md. Loc. R. 105.6; *see also* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*; *Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000). For the following reasons, the Court denies the Petition and declines to issue a certificate of appealability.

I.  **Background**

  A.  **Trial**

On February 13, 1998, Hollingsworth was indicted in the Circuit Court for Baltimore City on charges related to the murders of Charles Hemingway and David Jones, and the wounding of Kenneth Tyler. ECF No. 5-1 at 7. The case went to trial in April of 1999. The Court summarizes the operative facts as follows.[1]

---

[1] The facts are taken from the decision of the Maryland Appellate Court, formerly the Maryland Court of Special Appeals, in *Hollingsworth v. State*, Case No. 785 (Md. Ct. Spec. App. Feb. 23, 2000). *See* ECF No. 1-2 at 33–42.

On the evening of July 17, 1998, and into the next morning, a house party was taking place at a makeshift club located on the first floor of 915 West Baltimore Street ("the Club"). Steven King, who lived on an upper floor of the building, and his father, Charles King, hosted the party. ECF No. 1-2 at 33. The victims were among the many guests. *Id.* Steven and his brother, whose name is not apparent from the record, frisked all guests for weapons except for Steven's friend, Kevin Moses, and three disc jockeys: Vonzeal Bazemore, someone referred to as "Bo," and Hollingsworth. *Id.*

At some point, a fight broke out. Tyler overheard another guest tell Hollingsworth to "get the gun" and subsequently saw Hollingsworth put a gun in his waistband. ECF No. 1-2 at 34. Steven King next escorted Tyler, Jones, and another guest out of the Club. *Id.* Jones and Tyler, however, returned and approached Hollingsworth. *Id.* Hollingsworth pulled out what Tyler recognized as a Glock nine-millimeter semiautomatic pistol and shot at the men, killing Jones and wounding Tyler. *Id.*

Hollingsworth next ran to the front of the Club and fired several more shots. *Id.* At the same time, Baltimore City Police Detective, Daniel Fyffe ("Detective Fyffe" or "Fyffe"), drove past and saw many people running from the Club. ECF No. 1-2 at 35. An unidentified woman told Detective Fyffe that "[t]he guy has a gun," after which he heard between five and seven rapid gunshots inside the Club. *Id.* An African American male wearing a plaid shirt emerged from the front door and pointed a black semiautomatic gun at Detective Fyffe. *Id.* Fyffe, in response, fired two shots at the man, who retreated into the Club. At trial, Detective Fyffe could not definitively identify the shooter as Hollingsworth. *Id.*

Baltimore City Detective, Mark Wiedefeld ("Detective Wiedefeld" or "Wiedefeld"), also responded and found Jones' body at the far end of the bar.  The other two victims were already en route to the hospital.  *Id.*

Eventually, Hollingsworth was transported to the police station.  There, he gave three statements to the police.  The first, which was not used at trial, was taken at 5:45 AM, before the police developed him as a suspect.  ECF No. 5-2 at 59, 77–97.  Hollingsworth told Detectives that he had been at the Club but never claimed involvement in the shooting.  *Id.* at 61.

Additional investigation in the coming hours pointed to Hollingsworth as a suspect.  So around 11:30 PM, Detectives James Shields and Wiedefeld mirandized Hollingsworth and interviewed him.  At first, the conversation was not recorded, but Detective Leonard Willis and Detective Wiedefeld took notes of the interview ("Detective Notes").  ECF No. 5-9 at 39–40, 42–43, 47–48.  The Detective Notes were not introduced at trial, but they reflect that Hollingsworth had described how "a bunch of guys came into the club, talking about guns, one guy came straight at me with a black semi-auto handgun. I got the gun away from him and started to shoot him, once in the stomach, I'm not sure."  *Id*. at 47–48.  *See also* ECF No. 5-10 at 39 (a "[b]unch of boys came running in. I shot boy. I took gun from and stomach one time. Took shirt off, dropped gun, I shot that I took from guy who came at me. A guy started coming in talking about guns.  I was trying not to get killed. Me and Steve tried to stop it.").

Shortly after, around 11:57 PM, the Detectives tape recorded Hollingsworth's statement, which was admitted in full at trial.  It reads,

Hollingsworth:     Everybody just started fighting. So I was trying to grab him and he still was fighting. Everybody was fighting everything and then somebody came out of nowhere and hit me in my eye, busted my eye[.] So, I had a lot of blood in my eye.

Wiedefeld:     Okay.

Hollingsworth:    And I then, I then had the gun on me.

Wiedefeld:    Okay.

Hollingsworth:    And everything, so I was trying to get everybody off and everything. So when I grab, I had my little brother up in the corner, and I was like: man, go ahead man, go ahead. And it was like I was trying, they was trying I was trying to act like you know what I'm saying, telling them to back up. They knew I had a gun. They was like…

Wiedefeld:    Where was the gun, Mark?

Hollingsworth:    On my hip.

Wiedefeld:    Oh, it was on your person?

Hollingsworth:    Yeah.

Wiedefeld:    Okay.

Hollingsworth:    And they knew I had a gun. Instead of them backing up, they still want, they still want to try and Reds was trying to tell them to go back up, trying to go tell them to go ahead and nobody wasn't trying to listen and they just kept throwing chairs and stuff like that, trying to hit us. So I just got scared. I didn't want nobody. I ain't want nobody to hurt my little brother. I just too busy simply worrying about him and then the guy when he went, he went to come forward again, I was like man, go ahead. He was like man, shoot me, you going to shoot, shoot. I was like man, go ahead, man, go ahead. So then they grabbed the chair and tried to hit me and I just shot him. I shot him. I thought I shot him in the stomach.

Wiedefeld:    Okay.

Hollingsworth:    And then the other guy that was right behind him, I shot him, too, then I turned around and run, I just kept shooting.

Wiedefeld:    Okay. How many shots did you fire at him if you remember?

Hollingsworth:    I think three.

Wiedefeld:    Three, okay.

| Hollingsworth: | I couldn't really remember. I blanked out really after that . . . cause I ain't ever shoot nobody before and I really just, I ain't, I ain't going to say it felt good or nothing but it just, I ain't never had no feeling like that and then when it happened it's like I couldn't stop. |
| | |

***

| Wiedefeld: | Okay. Where did you, where did you get that gun that you had with you? |
| Hollingsworth: | I been had it. |

ECF No. 5-5 at 118–20, 122.

Hollingsworth also said that after he shot, he ran and "just kept shooting;" but when he tried to leave the Club, a police officer shot at him, so he went back inside the Club, dropped his plaid shirt and the gun, and then mingled with the crowd. *Id.* at 119–21.

Hollingsworth also said that there were "just too many guys and I was trying to get them out of my way," and asserted that he did not "want to hurt nobody there," but was just trying to protect himself and his little brother from being beaten to death by "about 12 of them trying to fight us two." ECF No. 5-5 at 122. He explained, "[I]t was just too many guys and I was just trying to get them out of my way." *Id.* Later, he added "I didn't want nothing like that to happen, when I was in that situation, I was just thinking about myself . . . I wasn't trying to die." *Id.* at 127.

A Glock pistol was ultimately recovered from the rear of the Club. The Glock included a nine-round magazine with one cartridge in the chamber. ECF No. 1-2 at 40. Law enforcement also found eight cartridge casings and a red plaid shirt inside the Club, and two additional casings outside the Club. *Id.* Police also recovered a fully loaded .357 revolver near a television set in the Club. *Id.* According to a law-enforcement firearms expert, that gun had not recently been fired.

*Id.* A week or two later, Charles King also turned in to the police a .38 caliber handgun he found in the Club. *Id.*

The State's firearm expert testified that of the eight cartridges found, two came from Detective Fyffe's Glock, and the rest came from the Glock seized from the scene. ECF No. 1-2 at 41. The expert also examined four .38 caliber bullets that had been at the Club, and while he believed they went with the .38 revolver, he could not say when the bullets had been fired. *Id.*

Hollingsworth put on a defense case, calling multiple guests from the party. Three witnesses, Tiesha Kendricks, Lonnie Byrd and Robert Hall, all stated that during the fight, one man said he would "take this to the guns" or words to that effect. ECF No. 1-2 at 41. Several of the guests then left the Club, returned, and "rushed to the bar," with one yelling to Hollingsworth that they were "not getting out of there alive." *Id.* And another witness said he saw someone hit Hollingsworth in the face with a gun. *Id.*

Ultimately, the jury convicted Hollingsworth of first-degree murder of Charles Hemingway, second-degree murder of David Jones, first- and second-degree assault of Kenneth Tyler, and related handgun offenses. ECF No. 5-7 at 9–11. The Circuit Court sentenced Hollingsworth to life plus fifty years' imprisonment. ECF No. 5-8 at 38–39.

Shortly after he was sentenced and while he still had counsel, Hollingsworth made several pro se requests for sentence modification or three-judge-panel review of sentence. *See* ECF No. 5-1 at 83–93, 95–99, 100–03, 104–12. As to one of these requests, the Circuit Court denied relief, although it is unclear from the docket which precise request had been denied. *Id.* at 11.

Nonetheless, Hollingsworth's counsel also moved for modification of sentence on August 12, 1999. *Id.* at 114–15. The Circuit Court responded that because Hollingsworth had asked the Court not to act on the request, the court would hold the motion in abeyance until Hollingsworth

6

secured new counsel.  ECF No. 11-2.  The motion does not appear to have been adjudicated.  ECF No. 5-1 at 6–82.

### B.   Direct Appeal

Hollingsworth appealed his conviction on three grounds: that insufficient evidence supported the first-degree murder conviction related to Charles Hemingway; that the trial court erred in in excluding evidence of Tyler's previous handgun conviction; and that it erred in admitting the hearsay statement of Vonzeal Bazemore.  ECF No. 5-1 at 117.  On February 23, 2000, the Maryland Appellate Court affirmed Hollingsworth's convictions and sentences in a written decision.  ECF No. 1-2 at 31–57.  And on June 27, 2000, the Supreme Court of Maryland denied Hollingsworth's petition for certiorari.  ECF No. 5-1 at 191.

### C.   State Post-Conviction Proceedings

Nearly ten years later, Hollingsworth initiated state post-conviction proceedings, ECF No. 15-1 at 37–65, and through counsel, supplemented the petition several times, *id.* at 73–97, 105–47.  Hollingsworth raised many issues with the post-conviction court, but he presses in this Petition, as he did in state court, the following: first, that the convictions should be vacated because the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), ECF No. 15-1 at 75–80, 92–95; second, that his trial counsel was ineffective for failing to introduce the untaped statements made to the Detectives that would have supported a self-defense theory, *id.* at 81, 95–96, 113; and third, that the prosecutor committed misconduct when she argued in closing that Hollingsworth never told the Detectives in his taped statement that he had seen anyone else approach him with a gun or that he shot in self-defense, *id.* at 105–06.

The Circuit Court conducted a five-day evidentiary hearing on the post-conviction petition.  ECF Nos. 5-9, 5-10, 5-11, 5-12, 5-13.  On July 14, 2015, the court denied the petition by written

decision. ECF No. 1-2 at 4–25. Hollingsworth sought leave to appeal the denial of his petition to the Maryland Appellate Court. ECF No. 15-1 at 171–202. The Appellate Court remanded the matter because the post-conviction court had not yet addressed Hollingsworth's prosecutorial misconduct argument. *Id.* at 255–56. The post-conviction court heard this issue on May 15, 2019 and denied Hollingsworth relief on June 14, 2019. ECF No. 5-14; ECF No. 1-2 at 26–30. The Appellate Court next affirmed the denial of the petition on April 30, 2021. ECF No. 5-1 at 323–42. And on September 22, 2021, the Supreme Court of Maryland denied Hollingsworth's petition for certiorari. *Id.* at 52–53.

### D.    Federal Habeas Petition

On March 21, 2022, Hollingsworth filed his Petition in this Court, pursuing the three state post-conviction claims described above. ECF No. 1. Respondents move to dismiss the Petition as untimely and as failing on the merits. ECF No. 5. The Court considers each argument in turn.

## II.    Timeliness of the Petition

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires that a federal habeas Petition be filed within one year from the latest of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Section 2244(d)(2), however, makes clear that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

As for Hollingworth's direct appeal, the Maryland Supreme Court denied certiorari on June 27, 2000. ECF No. 5-1 at 191. Thus, the convictions became final once the deadline to petition for certiorari with the United States Supreme Court expired on September 25, 2000. *See* U.S. Sup.

Ct. R. 13.   However, on August 12, 1999, Hollingsworth moved for sentence modification.  *Id.* at 114–15.  The Circuit Court held that motion in abeyance, and it had not yet been adjudicated at the time Hollingsworth filed this Petition.   The Fourth Circuit has construed a sentencing modification motion brought pursuant to Maryland Rule 4-345 as a collateral proceeding which tolls the AEDPA's one-year limitations period while the reconsideration motion remains pending. *See Mitchell v. Green*, 922 F.3d 187, 190 (4th Cir. 2019).   Thus, the Court cannot dismiss the Petition as untimely filed.[2]

Respondents alternatively press that the August 12, 1999, modification motion should not toll limitations because it was "successive" request.  ECF No. 5 at 38.  But the state court never saw it as such, and the motion was never denied on this basis.  In fact, the Circuit Court expressly stated it would hold the earlier motion in abeyance until Hollingsworth retained new counsel.  ECF No. 11-2.  And the motion for modification itself was timely under Maryland law.  *See* ECF No. 5 at 38; ECF No. 5-1 at 114–15.  Thus, the Court considers the Petition timely.

The Court next turns to the merits of the Petition.

---

[2] Admittedly, this decision is problematic in that the state modification motion had been held in abeyance for over two decades.  At that time Hollingsworth had filed the motion, Maryland Rule 4-345 did not include any time limit for the Circuit Court to rule.  But in 2004, the Maryland Legislature amended Rule 4-345, requiring adjudication of a timely filed reconsideration motion within five years.  The five-year limitation, however, applies "only to sentences imposed on or after July 1, 2004." *See* Court of Appeals of Maryland, Rules Order (May 11, 2004), available at https://www.courts.state.md.us/sites/default/files/import/rules/rodocs/ro-rule4-345.pdf (adopting amendments to Rule 4-345, including the five-year limitation for review, and declaring amendments effective to "all sentences imposed on or after July 1, 2004"); *see also* Maryland Fiscal Note, 2016 Sess. S.B. 121 ("The court's May 11, 2004 Rules Order adopting the rule, which for the first time included the five-year limit on a circuit court's ability to revise a sentence, established the prospective application of the rule, ordering that the amended rule 'shall take effect and apply to all sentences imposed on or after July 1, 2004.'").  Thus, the Court construes the unresolved motion for sentence modification as having tolled the time to file this Petition.

### III.    Merits of the Petition

#### A.    Standard of Review

Under the AEDPA, this Court's review of an underlying state court decision is narrowly circumscribed, according relief only if the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Bell v. Cone*, 535 U.S. 685, 693–94 (2002); *Williams (Terry) v. Taylor*, 529 U.S. 362, 379 (2000). The Court reviews the "the last reasoned decision of a state court addressing the claim." *Allen v. Stephan*, 42 F.4th 223, 247 (4th Cir. 2022) (quoting *Woodfolk v. Maynard*, 857 F.3d 531, 544 (4th Cir. 2017)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* at 407.

In other words, to obtain relief, Hollingsworth must identify the "clearly established" legal principle on which he relies. To qualify as "clearly established," a principle must originate from an actual Supreme Court holding, not from its passing dicta. *See White v. Woodall*, 572 U.S. 415, 419 (2014). Hollingsworth also must describe this holding with specificity. *See Brown v. Davenport*, 596 U.S. 118, 136 (2022). He cannot recite a holding at a "high level of generality." *Lopez v. Smith*, 574 U.S. 1, 6–8 (2014) (per curiam) (citation omitted); *Metrish v. Lancaster*, 569

U.S. 351, 367–68 (2013). Circuit precedent cannot turn "a general principle of Supreme Court jurisprudence into a specific legal rule" that has not been stated by the Supreme Court. *Lopez*, 574 U.S. at 7 (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)).

If relying on the "unreasonable application" clause, Hollingsworth next must show that the state court engaged in an "unreasonable application" of clearly established law. *Williams*, 529 U.S. at 364–65. Under this test, a federal court's belief that a state court erred when applying a legal principle alone does not suffice. Rather, this Court must conclude that the state court's application was "objectively unreasonable," *White*, 572 U.S. at 419 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)); that is, when the error was "well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103.

With this standard in mind, the Court addresses each claim for relief in turn.

**B.      Failure to Disclose Exculpatory Evidence**

Hollingsworth first contends that the State withheld the Detective Notes, in violation of *Brady v. Maryland*. ECF No. 1-2 at 14–25. To prove the prosecution failed to honor its *Brady* obligations, the defendant must show that the evidence (1) had been either exculpatory or impeaching of a state witness; (2) had been withheld from the defense; and (3) was "material either to guilt or to punishment." *Strickler v. Greene*, 527 U.S. 263, 280–82 (1999) (quoting *Brady*, 373 U.S. at 87) (internal quotation marks omitted); *see also United States v. King*, 628 F.3d 693, 701–02 (4th Cir. 2011) (defendant bears the burden of establishing a *Brady* violation). Evidence is "material" if a reasonable probability exists that, "had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)).

When Hollingsworth raised this claim in his state post-conviction proceedings, he described the Detective Notes as the "driving force" of his petition because the notes squarely supported his self-defense theory. ECF No. 5-9 at 24. Thus, the undisclosed Detective Notes, says Hollingsworth, would have corroborated that he shot at the victims to protect himself, and that the Detectives coerced him to change his story prior to taking the recorded statement. *Id.* at 24–30.

As for disclosure of the notes, Detective Wiedefeld testified at the post-conviction hearing that the notes had been turned over to the prosecutor. ECF No. 5-9 at 57, 61. However, the prosecutor at the time admitted that the notes were not among the State's written disclosures. *Id.* at 64–66. Nonetheless, the prosecutor testified that in addition to disclosing the taped statement, it was her practice to go through every page of the Detective's file with defense counsel in advance of trial. ECF No. 5-10 at 63, 72. The prosecutor also testified that she was "confident" about this disclosure because she had no reason to withhold the statements, and that it was her "practice to be very generous with discovery," because she "wasn't trying to hide anything," *id.* at 78–79. *See also id.* at 80 (Defense counsel "did come to my office and we discussed the case, and normally when that would happen we would go through the entire file.").

Hollingsworth's trial counsel, Anne Marie Gering ("Gering"), also testified that while she did not receive the Detective Notes before trial, she did recall meeting with the prosecutor for about an hour and reviewing many documents. ECF No. 5-11 at 55, 64, 75–76. But Gering also testified she had been discussing a self-defense theory with Hollingsworth so she would have remembered seeing the Detective Notes had they been presented in the evidence review. ECF No. 5-11 at 54, 77.

The post-conviction court denied relief, principally because Gering had learned of the Detective Notes during the meeting with the prosecutor and at a related pretrial suppression hearing when she challenged the admissibility of the taped statement.  ECF No. 1-2 at 13. Accordingly, the post-conviction court reasoned that "*Brady* offers a defendant no relief when the defendant knew or should have known facts permitting him or her to take advantage of the evidence in question."  *Id.*  The Appellate Court affirmed the post-conviction court, concluding that the factual determination regarding the Detective notes had not been clearly erroneous and thus no *Brady* error occurred.  ECF No. 5-1 at 329–33.

Essentially, Hollingsworth now asks this Court to reject the post-conviction court's factual findings that the Detective Notes had been disclosed, or at a minimum, that defense counsel knew of and reviewed the notes before trial.  State court factual findings are "presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part."  *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010).  This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)."  *Id.* at 379.

This Court cannot conclude that the state court findings were erroneous or otherwise unreasonable.  The post-conviction court credited the prosecutor's testimony that she had, at a minimum, reviewed the Detective Notes with Gering, and Gering knew that the Detective had turned over the notes to the prosecutor from the suppression hearing.  ECF No. 5-2 at 22, 25, 43. Gering also asked Detective Wiedefeld about his pre-taped interview of Hollingsworth at trial, and at no point objected to any claimed nondisclosure of such notes.  Accordingly, based on this record,

13

the state court's factual finding was not unreasonable. *See United States v. Agurs*, 427 U.S. 97, 103 (1976), *holding modified by United States v. Bagley*, 473 U.S. 667 (1985). Nor could the alleged withholding of the Detective Notes satisfy the claim in any event because the record supports that Gering knew of the notes at the time of trial and never made use of them. *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 n.6 (4th Cir. 1985). The Court thus denies relief on this ground.

### C.    Ineffective Assistance of Counsel

Hollingsworth next argues that Gering rendered ineffective assistance when she failed to use the Detective Notes to shore up Hollingsworth's self-defense theory, ECF No. 1-1 at 25–29, and when she failed to object to the prosecutor's supposed mischaracterization of Hollingsworth's statements to the police, *id.* at 35. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, 580 U.S. 100, 118 (2017). To succeed on the claim, the petitioner must show not only that counsel's performance was deficient, but that he suffered prejudice. *Strickland*, 466 U.S. at 687; *see Buck*, 580 U.S. at 118–19.

As to the performance prong, the petitioner must show that his attorney's performance fell "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see Harrington*, 562 U.S. at 104. The inquiry focuses on whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). This is a demanding standard. *Buck*, 580 U.S. at 118. The Court must remain "highly deferential" to an attorney's strategic decisions, affording a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. *See*

14

*also Stokes v. Stirling*, 10 F.4th 236, 246 (4th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2751 (2022), and *adhered to*, 64 F.4th 131 (4th Cir. 2023) (citing *Strickland*, 466 U.S. at 689).

As to the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Buck*, 580 U.S. at 119. A petitioner fails to carry his burden if the record demonstrates the alleged error, if corrected, likely would not have made "any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010). Importantly, a petitioner must satisfy both Strickland prongs, and so the Court need not address both "components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. *See also Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). With this standard in mind, the Court considers each claimed deficiency separately.

Beginning with counsel's purported failure to use the Detective Notes at trial, the state post-conviction court concluded that Gering's decision was "not unreasonable," given the evidence at trial. ECF No. 1-2 at 20. The court reasoned that Hollingsworth's own inconsistencies between the taped and untaped statements, combined with multiple eyewitnesses identifying him as the shooter and the only one with a gun, risked that introducing the untaped statements would make Hollingsworth appear less credible. *Id.* The Appellate Court concurred that the Detective Notes, if used, would undermine counsel's efforts to "portray Mr. Hollingsworth as a defendant with a consistent story who was willing to cooperate." ECF No. 5-1 at 335. Because the notes, when combined with the recorded statement, rendered Hollingsworth's story a moving target, the Appellate Court determined that exclusion of the notes could only have helped him. *Id.* at 336 ("a prejudice finding depends on a jury being more likely to believe him *as a result of* his inconsistent statements to police, not in spite of them.").

Hollingsworth argues that the post-conviction court's conclusion was unreasonable because it imputes a strategy to his trial counsel that she did not adopt. ECF No. 1-1 at 26–27. Rather, says Hollingsworth, his counsel's strategy was principally one of self-defense, and so the failure to use the notes that would have supported the defense amounts to ineffective assistance. *Id.* at 26; ECF No. 5-12 at 78–80. Hollingsworth emphasizes that even Gering admitted that someone else having a gun is "better justification for shooting someone" and she would have had a stronger case for self-defense with the Detective Notes. ECF No. 5-12 at 80–81.

Although Hollingsworth has a point, the Appellate Court's determination is easily reconciled. The court had concluded that Gering's strategy principally was to "portray Mr. Hollingsworth as a defendant with a consistent story who was willing to cooperate." ECF No. 5-1 at 335. While this theme is not at odds with self-defense, it did present for Gering difficult strategic decisions about how forcefully to press the existence of earlier statements that arguably conflicted with his recorded interview. ECF No. 1-1 at 23.

On this record, reasonable minds could certainly disagree about the state court's determination. But reasonable disagreement is not enough. *Brown v. Davenport*, 596 U.S. 118, 135 (2022) (citing *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)). "A petitioner must persuade a federal court that no 'fairminded juris[t]' could reach the state court's conclusion." *Brown*, 596 U.S. at 135 (quoting *Davis v. Ayala*, 576 U.S. 257 (2015)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102. Although Hollingsworth has raised good counterpoints to the state court determination, the Court cannot say that Hollingsworth has met this exacting standard. Accordingly, his ineffectiveness claim must be denied.[3]

---

[3] Hollingsworth separately argues that counsel's performance had been constitutionally deficient because, without the missing Detective Notices, she could not have credibly objected to the state's closing argument. ECF No. 1-1 at

16

### D.    Prosecutorial Misconduct

Hollingsworth lastly argues that he is entitled to relief because the prosecutor had engaged in misconduct when she elicited "perjured testimony" from Detective Wiedefeld and lied in her closing argument.  ECF No. 1-1 at 29–37.  The Court addresses each in turn.

As for sponsoring a perjuring witness, Hollingsworth isolates the following testimony:

Prosecutor:    Could you describe the defendant's demeanor during the interview, during the conversation you had prior to the taped interview?

Wiedefeld:    He was pretty upset. He was afraid. He was pretty remorseful. Defendant saying things like it was so stupid, things to that effect.

ECF No. 5-5 at 114.  From this, Hollingsworth argues that Wiedefeld's testimony left the jury with the false impression that Hollingsworth had given the police one "seamless, consistent statement from the start of the pre-tape to the end of the tape," when, in reality, he also gave two prior interviews.  ECF No. 1-1 at 31.  The post-conviction court rejected this argument out of hand, and the Appellate Court summarily affirmed that decision.  ECF No. 5-1 at 338; ECF No. 1-2 at 16; ECF No. 15-1 at 161.  The Court sees no good ground to upset the state court's reasoned judgment.

To be sure, a prosecutor may not knowingly use false testimony to secure a conviction. *See Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959).  But the petitioner must show that the questioned testimony was false, that the prosecutor knew it was false, and the evidence was material to the case.  *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002). A petitioner can show materiality for *Napue* purposes "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103, *as modified in United States v. Bagley*, 473 U.S. 667 (1985), *accord Daniels v. Lee*, 316 F.3d 477, 493 (4th Cir. 2003).  But Hollingsworth marshals no evidence that Detective Wiedefeld's testimony was false.  The

---

35. This contention fails for the same reasons already discussed.  Nor has Hollingsworth demonstrated that he suffered prejudice from his counsel's failure to object.

challenged testimony is simply Detective Wiedefeld's description of Hollingsworth as remorseful, nervous and contrite. Nothing—not even the Detective Notes—contradicts this representation. Thus, Hollingsworth is not entitled to relief on this basis.

As to Hollingsworth criticism of the prosecutor's closing argument, he contends that the prosecutor wrongly misled the jury by referring to his taped statement as his "entire" statement to the police. ECF No. 1-2 at 33. The challenged portion of the prosecutor's closing argument reads,

> Now again, you have [Hollingsworth's] entire statement on tape. And the transcript of it. You can look at the entire statement. These are things I would like to point out. The defendant's own words, his own words tell you that he is guilty of these crimes. He says nothing about anyone having a gun, nothing about anyone hitting him with a gun. Nothing about self defense. He says he didn't want to get beat to death. He says nothing about anyone else having a weapon other than himself. . . . Does he say someone came out of nowhere and busted me in my eye with a gun? The butt of a gun? No. But did his three witnesses or two of his witnesses say that? Why would they lie about that? Because they want you to believe someone else in there had a gun so that you'd believe this is self defense. Isn't that an important factor for the defendant to include in his statement? Someone else had a gun? He doesn't mention that.

ECF No. 5-6 at 59–61.

The post-conviction court did not squarely address whether this argument amounts to misconduct. ECF No. 1-2 at 4–25. However, the Appellate Court rejected the contention, reasoning that the prosecutor had simply confined her arguments to the evidence before the jury. ECF No. 5-1 at 340. The Appellate Court thus concluded that to fault the prosecutor for failing to comment on evidence *not* in the record "would itself inject reversible error into the case." *Id.*

The Court agrees with the Appellate Court's analysis and certainly cannot conclude it was an unreasonable application of settled law. The record, in short, reflects as the Appellate Court found: the prosecutor cabined her argument to "the entire statement *on tape*." ECF No. 5-6 at 60 (emphasis added). She also did not hide from the jury that Detective Wiedefeld both talked to Hollingsworth about the crime and made notes before recording Hollingsworth's statement. ECF

No. 5-5 at 113 (Wiedefeld testifying he spoke with Hollingsworth for "less than an hour," *and* "made some notes" about the shooting before deciding to "tape the interview"). Defense counsel did not object during Detective Wiedefeld's direct, and on cross examination, pointedly asked about what Wiedefeld had said to Hollingsworth during the "pre-taped" interview. *Id.* at 130. Accordingly, the Court sees no error in the Appellate Court's determination and denies relief on this ground.

Based on the foregoing, Hollingsworth's petition must be denied.

## IV.     Certificate of Appealability

A petitioner may not appeal the dismissal or denial of a federal habeas petition without first receiving a certificate of appealability. 28 U.S.C. § 2253(c)(1). The Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Under the controlling standard, a petitioner must show that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). For a certificate of appealability to issue, a petitioner need not prove "that some jurists would grant the petition for habeas corpus." *Id.* at 338.

Hollingsworth's claims have been dismissed on substantive grounds. Upon review of the record, this Court finds that Hollingsworth has not made the requisite showing. The Court therefore declines to issue a Certificate of Appealability. Hollingsworth may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

19

3/27/2026
Date

/s/
Paula Xinis
United States District Judge

20